J. A18027/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF BLAKE SCOTT WALKER, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: DANIELLE MALONE | : | No. 17 MDA 2016 |

Appeal from the Order Entered December 3, 2015,
in the Court of Common Pleas of Adams County
Orphans' Court Division at No. OC-00022-2012

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND STEVENS,* P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED SEPTEMBER 09, 2016**

Danielle Malone ("Mother") appeals from the December 3, 2015 order entered in the Court of Common Pleas of Adams County that dismissed her objections to final accounting and adjudication/statement of proposed distribution for the estate of Blake Scott Walker, deceased, and entitling David Walker ("Father") to all net estate proceeds and to the remaining annuity payments from American Guaranty Service Corporation. We affirm.

The orphans' court made the following findings of fact:

1. Blake S. Walker (hereinafter "Blake") was born on November 30, 1993.

2. Blake's mother is Danielle Malone (f/k/a Danielle Mattern-Parris) who currently resides [in the] United Kingdom.

3. Blake's father is David Walker who currently resides [in] Gettysburg, Adams County . . . .

---

* Former Justice specially assigned to the Superior Court.

4.    Blake's parents were married on February 13, 1993.

5.    Due to significant medical malpractice/errors, Blake suffered injuries at birth and, as a result, he was rendered completely disabled.

6.    At the time of Blake's birth, the family was living in the York Springs, Adams County area and several months later moved to . . . Arendtsville, Adams County.

7.    The parents separated in November 1995. Mother and Blake remained at the family residence and Father moved to the home of his parents . . . .

8.    At some point in 1996, Father initiated a divorce action against Mother, docketed [in] Adams County.

9.    Sometime in late 1996 or early 1997, Father and his paramour, Bella, moved to a residence in the Mount Alto, Quincy Township, Franklin County area and Mother and Blake moved to a residence in the Fairfield, Adams County area.

10.   At some point in 1997, Mother requested that Father take Blake for a week, which Father agreed to do.  This involved the transfer of all the special equipment needed for Blake's care as well as shifting the nursing staff that assisted in his care to Father's home.

11.   Shortly thereafter, Mother asked Father to take Blake for a two-week period reportedly because she had been in an automobile accident and hurt her back.  Father agreed to the request with the understanding that Mother would notify him when she was ready for his return to her care.

12. At the end of the two-week period, Mother did not contact Father requesting Blake's return nor was Father able to reach her by telephone.

13. Mother never saw the child again.

14. Up to this point, Mother reportedly provided good care [to] Blake both before and after his parent's [sic] separation.

15. Since Blake was placed in Father's home, he has been under the general medical care of Scott Jeager, M.D.[] Dr. Jeager described that Blake had severe neurologic and genetic illness [sic] rendering him without gross motor or communication skills except for the expression of pain. He suffered seizure disorders that required medication. Blake took nourishment through feeding tubes. He was confined to bed and required uninterrupted care.

16. Mother was represented in the divorce and custody action by John F. Pyfer, Esquire, Jr. Eventually, Father was represented by Patrick W. Quinn, Esquire.

17. Attorney Quinn testified that Father was paying child support for Blake when he was in Mother's custody. The parties were scheduled for a custody conference in 1997 or 1998 after which Father had custody of Blake.[Footnote 3]

> [Footnote 3] . . . [A]n Order of Court dated February 17, 1998 [] [indicates] that a custody conference was scheduled [] that day. The Order noted that neither Mother nor Attorney Pyfer appeared. Temporary custody of Blake was granted to Father. [The trial court] directed the Prothonotary to send a copy of the

Order to Mother at [her residence] and to Attorney Pyfer.

18.   On March 11, 1998, Father filed a Petition to obtain exclusive possession of the former marital home [in] Arendtsville.   On April 22, 1998, an Order was entered . . . granting that request.   Attorney Quinn was directed to serve Mother.[Footnote 4]

> [Footnote 4] . . . [Father] averred that in 1997, Mother transferred custody of Blake to him and since that time, Blake has been living with he [sic] and Bella.  He further averred that it would be in the best interest of Blake for him to reside in the former residence.   The record contains a Certificate of Service that the April 22, 1998 Order was served upon Attorney Pyfer three days later.

19.   Attorney Quinn advised Father to seek child support from Mother.   Father initiated that action [in] Adams County . . . .   Records indicate that the initial charge to the account was entered on June 16, 1998, in the amount of $1,382.50, and was charged thereafter on a weekly basis in the amount of $88.25.

20.   Sometime in 1998, Father, Bella and Blake moved to [the former marital residence in] Arendtsville.

21.   In 1999, Father and Bella became the parents of a daughter named Ashley.   As an infant, they would have Ashley in the same room with Blake while they were tending to his needs and noticed that Blake would turn his head away from the side where Ashley was located.

22.   In 2002, Father, Bella and Blake moved to 595 Goldenville Road.   Father did not

specifically advise Mother of the move but did notify the Domestic Relations Office, received support checks at the address, and did not request Domestic Relations not to disclose his address to Mother.

23. Mother and Father entered into a Marriage Settlement and Separation Agreement dated October 9, 2002. Mother was represented by [counsel] in Houston, Texas. Mother executed the agreement in Texas on February 13, 2003. Therein, it is written that "the parties are the natural parents of one (1) minor child: Blake S. Walker, born November 30, 1993." The Agreement also addresses tort claims filed in the Franklin County Court of Common Pleas . . . involving the parents' individual claims and claims of "their minor child" arising out of the injuries suffered at the child's birth. Mother agreed that any settlement or judgment received on behalf of Blake "shall be solely and exclusively controlled by Husband as long as Husband uses any proceeds from any settlement and/or judgment for the benefit of the parties' minor child." (emphasis added).

24. As of September 25, 2003, Mother had not made any payments on the child support order and the arrearage had accumulated to $24,213.39. On that date, credits were made on the account in the amounts of $1,271.43 and $5,953.58 reducing the arrearage to $16,988.38. Thereafter, the support was charged at $63.00 per week.[Footnote 7]

> [Footnote 7] . . . The basis for the credits, and the reason for the adjustment in the weekly charge, was not explained by the testimony presented in the hearing.

25. The parents were divorced on January 13, 2004.

26. Sometime in 2005 while Mother was living in Seattle, she became aware that a bench warrant was issued for her in the child support matter. She retained the services of Tracy Sheffer, Esquire, an attorney in Gettysburg, [Pennsylvania] to assist her in that matter.

27. On September 13, 2005, Mother sent a fax message to Attorney Sheffer wherein she wrote "I am not sure which direction to go after this as far as custody, law suit money, etc . . . Also I want to know Blake's overall condition and medical prognosis."

28. The first credit on the child support account after September 25, 2003, was recorded October 27, 2005, with the payment of $355.00. After that credit, the arrearage stood at $23,500.38.

29. Mother's child support obligation was changed to $70.00 per week on or about November 25, 2005. Thereafter, it appears that she made regular payments on the account.

30. Father and Bella were married on May 19, 2007.

31. On December 10, 2007, the child support obligation was credited $5,368.34. Reportedly, this came about because Mother needed to go to Canada for work purposes and the arrearage created an issue with her passport.

32. Thereafter, Mother continued to make regular payments on the child support account.

33. After August 2, 2010, no more charges were made on the child support account. At that point, the arrearage totaled $17,278.39.

34. Blake died on February 25, 2011.

35. [Mother and Father settled the child support arrearage.]

36. Mother testified that in 1997 she moved to Houston, Texas where she lived for 3.5 years, then moved to Seattle, Washington where she lived for 13 years, then moved to England where she has lived for 3.5 years.[Footnote 16]

> [Footnote 16] This recollection is obviously lacking historical accuracy in that it totals 20 years over an 18-year period. This is especially significant when trying to pinpoint the time Mother left the Adams County area.

37. From the time Blake began living with Father and Bella, they and the nursing staff were his sole caretakers. Bella even quit her job in 1999 to devote more time to his care.

38. Dr. Jeager noted that he was unable to determine the level of Blake's functioning. Blake had limited responses to whatever he heard and did not smile.

39. Dr. Jeager reported that Blake's condition was such that institutionalization was the normal path taken for care. He found the care given to Blake by Father and Bella to be extraordinary. When Blake would grimace or be agitated, Father and Bella were able to calm him. In Dr. Jeager's opinion, the care they provided Blake kept him out of the hospital and extended his life expectancy significantly.

40. After departing the Adams County area, Mother had no conversations with Father about Blake's condition nor did she send him any cards or gifts.

41. Throughout Blake's life, his maternal grandfather lived in the York Springs area. After Blake began living with Father, the grandfather made no effort to see him.

42. Throughout Blake's life, his paternal grandparents resided at 605 Goldenville Road. Mother had been to this home. Their telephone number was published.

Order of court, 12/3/15 at 1-7 (footnotes 1, 2, 5, 6, 8-15 omitted).

The orphans' court set forth the following procedural history:

1. On July 25, 2011, Father was granted letters to serve as Administrator of Blake's estate.

2. On March 15, 2012, Father, as Administrator, filed the First and Final Account for Blake's estate.

3. Therein, it was reported that the sole asset of the estate consists of the balance from a certain 20-year guaranteed annuity purchased as part of a structured settlement of the medical malpractice action in Franklin County, Pennsylvania. The estate would consist of the monthly annuity distributions from the period March 2011 through February 2012, with the right of Blake's heirs to receive the remaining monthly distributions through January 2024.

4. Father, as Administrator, proposed that the entire intestate share of the estate be distributed to him and that Mother's share be forfeited pursuant to 20 Pa.C.S.A. § 2106(b)(1).

5. On April 16, 2012, Mother filed her Objection to the Account and proposed distribution.

6. On May 3, 2012, the Pennsylvania Department of Public Welfare filed its Objection asserting

> ownership of, or a lien upon, the annuity disbursements.
>
> 7.  The Court conducted a pre-hearing conference on June 14, 2012.
>
> 8.  On June 25, 2012, the Pennsylvania Department of Public Welfare filed its Amended Objection.
>
> 9.  On August 12, 2014, this Court ruled that the Pennsylvania Department of Public Welfare was entitled to 85.9% of all post-death annuity payments.
>
> 10. On September 2, 2014, the Estate filed Exceptions to the Court's Order.
>
> 11. By Order dated December 22, 2014, this Court approved a settlement arrived at between the Pennsylvania Department of Public Welfare and the Estate wherein the Department was to be paid $150,000.00 in satisfaction of its claim. Mother, through counsel, consented to that resolution. Payment was acknowledged on March 18, 2015.
>
> 12. Hearing on Mother's Objection was held on October 26, 2015.

Order of court, 12/13/15 at 7-8.

Mother raises the following issue for our review:

> Whether the [orphans'] court abused its discretion or made an error of law when it concluded, against the weight of the evidence, that Mother deserted the child pursuant to 20 Pa.C.S.[A.] § 2106(b)(1) and therefore forfeited any right to inherit from her deceased child[?]

Mother's brief at 17.

We begin with our standard of review:

- 9 -

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Estate of Fuller*, 87 A.3d 330, 333 (Pa.Super. 2014) (citation omitted).

Section 2106(b) provides, in relevant part:

> **(b)** **Parent's share.**--Any parent who, for one year or upwards previous to the death of the parent's minor or dependent child, has:
>
> (1) failed to perform the duty to support the minor or dependent child or who, for one year, has deserted the minor or dependent child
>
> . . . .
>
> shall have no right or interest under this chapter in the real or personal estate of the minor or dependent child. The determination under paragraph (1) shall be made by the court after considering the quality, nature and extent of the parent's contact with the child and the physical, emotional and financial support provided to the child.

20 Pa.C.S.A. § 2106(b).

With respect to "desertion," this court has held:

> The definition of "desertion" is "the intentional and substantial abandonment permanently or for a period of time stated by law without legal excuse and without consent of one's duties arising out of a status (as that of husband and wife or parent and child)." ***Webster's Third New International Dictionary*** 611 (1971). "Desertion" is also defined as "the willful and unjustified abandonment of a person's duties or obligations, esp. to military service or to a spouse or family." ***Black's Law Dictionary*** 478 (8th ed. 2004). By definition, we hold that desertion in the context of Section 2106 is a parent's intentional and willful abandonment of a minor or dependent child.

***Estate of Fuller***, 87 A.3d at 334.

Here, the orphans' court found that although Mother paid some court-ordered support, her arrearages on the date of Blake's death exceeded $17,000, and she, therefore, refused or neglected to perform her duty of financial support. The orphans' court further found that Mother deserted Blake because she had no physical or emotional contact with him from 1997 until his death in 2011, which far exceeds the one-year statutory desertion period. Although Mother concedes that she had no physical or emotional contact with Blake during that period, she contends that there was "ample evidence that [her] relationship with Blake was obstructed by two (2) glaring and insurmountable obstacles." (Mother's brief at 27.) Mother contends that the first "obstacle" was Blake's extreme cognitive and physical disabilities, and because of those, he "was unable to have any meaningful relationship with Mother (and vice versa)." (***Id.***) Accordingly, Mother claims that she never sent Blake gifts or cards and never telephoned or visited him

because he would have never known if he had received gifts, cards, telephone calls, or visits. (*Id.* at 28.) Mother identifies the second obstacle as "Father's consistent attempts to erase Mother from Blake's life." (*Id.* at 30.)

The orphans' court found Mother's testimony "incredulous" and "self-serving." We defer to the factual findings and credibility determinations made by the orphans' court, so long as they are supported by the record. *See Estate of Fuller*, 87 A.3d at 33. After carefully reviewing the entire record, we find that it amply supports the trial court's findings of fact, and we decline Mother's invitation to reassess her credibility.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2016